**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 7 |
| IRA LAWRENCE BRODY | |
| Debtors. | Case No. 17-22951 (RDD) |

---------------------------------------------------------------x

| | |
|---|---|
| WILLIAM M. BRYAN, INC. | Adversary Proceeding |
| Plaintiff | |
| v. | |
| IRA LAWRENCE BRODY | No. 17-08282 (SHL) |
| Defendants. | |

---------------------------------------------------------------x

## POST-TRIAL DECISION

A P P E A R A N C E S:

**Keith W. Berglund**
*Counsel for William M. Bryan, Inc.*
149 South Barrington Ave
Los Angeles, CA 90049

**Ira Lawrence Brody**
*Defendant/Debtor Pro Se*
613 Purchase Street
Rye, NY 10580

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the merits of the above-captioned adversary proceeding commenced by William M. Bryan, Inc. ("WMB") in the Chapter 7 case of Debtor Ira Lawrence Brody. WMB contends that Mr. Brody's debt to WMB cannot be discharged in this bankruptcy case pursuant to Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Bankruptcy Code. Trial took place in this case on November 28, 2018, and the parties subsequently submitted post-trial briefs. *See* Post-Trial Brief of William M. Bryan, Inc. [ECF No. 21] (the "WMB Brief"); Statement of Ira Lawrence Brody [ECF No. 22] (the "Brody Brief"). Based on the evidentiary record and for the reasons set forth below, the Court finds that WMB has met its burden under Section 523(a)(4) of the Bankruptcy Code and the debt owed to it is non-dischargeable. This Decision constitutes the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

Mr. Brody is both a highly intelligent and credentialed individual. Mr. Brody graduated from Tulane University with a degree in political economy, American University with an M.B.A., and Cardozo Law School with a J.D. Def. Exh. 1 (the "Brody Deposition") at 5:2-7:9. Mr. Brody is also licensed to practice law before the courts of the State of New York. Brody Dep. at 58:16-59:2. Upon graduating from law school, Mr. Brody served in the administration of New York City Mayor Rudolph Giuliani and in the administration of New York Governor George Pataki. Brody Dep. at 8:10-12:8.

After his time in government service, he spent several years managing local newspapers and a brief period working on the New York State Olympic Games Committee. Brody Dep. at 13:2-14:5. Mr. Brody then began working in the insurance premium finance industry with a company known as InsCap. Brody Dep. at 14:13-21. In that industry, business entities arrange

2

loans from various sources of funding—including banks, hedge funds, and individuals—to fund the purchase of certain life insurance policies. Brody Dep. at 22:11-20, 35:4-8. As Mr. Brody described the process, a capital aggregator takes out a loan with a bank, hedge fund, or individual to buy a policy note from the insured and then pays the policy premiums. Brody Dep. at 127:6-13. Those funds are then repaid, plus a commission, in around 30 days. Brody Dep. at 35:8-11. These deals are profitable because "the commission on those life insurance policies [is] greater than the premium paid." Brody Dep. at 35:8-22. In an example given by Mr. Brody, a life insurance premium of $100 could result in a return of principal plus commissions of up to $121, or a net profit of up to $21. Brody Dep. at 35:12-22. Mr. Brody learned about the structure of these transactions from others at InsCap, where he ultimately rose to the position of Chief Operating Officer. Brody Dep. at 27:18-28:19.

      Eventually, Mr. Brody left InsCap to start multiple limited liability companies in the insurance premium finance industry, including Broad Park Capital, LLC ("BPC") and Life Finance Capital, LLC ("LFC"), both of which were organized under the laws of Tennessee. Brody Dep. at 29:7-30:11, 79:14-80:8. LFC is a subsidiary of BPC. Brody Dep. at 79:14-23. Mr. Brody was one of the few employees at BPC. Brody Dep. at 31:3-5 (stating that BPC only had three employees during its existence). By 2012, Mr. Brody was the only employee at BPC. Brody Dep. at 32:1-4. Mr. Brody saw himself, BPC, and LFC as acting akin to an "architect" or facilitator of insurance premium financing transactions. Brody Dep. at 126:19-127:5. Mr. Brody "designed" the entire "system" upon which these transactions were based, provided "generic documents," and created term sheets, but saw himself as divorced from the individual transactions actually being effectuated. Brody Dep. at 126:21-128:7. Instead, individuals including Joseph Bartholomew and Mark Goodman would source the policies and transfer the

3

loaned funds as necessary. Brody Dep. at 113:16-116:6, 127:6-13. However, Mr. Brody also testified that his usual role in insurance premium financing transactions was to transfer loaned funds from the lender to the insurance carriers. Brody Dep. at 42:12-19.

As part of BPC's and LFC's business, Mr. Brody engaged in transactions with Plaintiff WMB, a California corporation, and its principal and namesake, William M. Bryan, a California resident. Pl. Exh. 47 ¶¶ 2-3, 5; Compl. ¶ 8. The parties completed at least one transaction successfully. Pl. Exh. 47 ¶ 5. In that transaction, WMB loaned $279,560 to Mr. Brody, Mr. Bartholomew, and other related parties, and WMB was repaid $290,742 after fees were deducted. *Id*. After this successful transaction, the parties discussed another insurance premium financing transaction involving four insurance policies and a loan from WMB of $552,475. *Id*. Before WMB would agree to lend this amount, however, it proposed additional protections for the transaction. More specifically, WMB requested that an escrow agent receive the funds— rather than BPC, Mr. Brody, or Mr. Bartholomew—and that the escrow agent transfer the funds directly to the insurance carriers. *Id*. WMB also requested that the escrow agent be required to produce an acknowledgement to WMB that the insurance carriers received the funds. *Id*. If the acknowledgements were not timely received by WMB, the escrow agent would deliver pre-signed cancellation notices within a 30-day statutory "free look" period and return the loaned money to WMB. *Id*. WMB requested these protections to "insure the security of the transaction." Pl. Exh. 47 ¶ 5.

Mr. Brody sent WMB a diagram outlining BPC's role in the transaction, which included the forwarding of the necessary documentation memorializing the transaction to WMB and BPC forwarding the funds to the life insurance company. *Id*. ¶ 19; Pl. Exh. 44. The diagram also classified the overall structure of the transaction as a specialty purpose trust. Pl. Exh. 44. Mr.

4

Brody, on behalf of LFC, prepared a term sheet dated February 13, 2012, memorializing the terms of the transaction that included WMB's proposal to use an escrow agent. Pl. Exh. 1 (the "February 13th Agreement"); Pl. Exh. 47 ¶ 6.

Despite the agreement among the parties and the language in the term sheet, the transaction did not proceed as planned. WMB wired the funds to the agreed upon escrow agent, David Nelson, pursuant to the terms of the February 13th Agreement. Pl. Exh. 5; Pl. Exh. 47 ¶ 7. However, Mr. Brody then instructed Mr. Nelson to make wire transfers to accounts that he personally controlled, rather than send the funds directly to the insurance carriers as required by the February 13th Agreement. Pl. Exh. 9; Brody Dep. at 113:16-24. Mr. Brody then took $50,000 for himself from these WMB funds, wired an additional $30,000 to Mr. Bartholomew, and then wired the remaining funds to Mr. Goodman. Brody Dep. at 115:17-117:3. Despite taking $50,000 of these WMB funds, Mr. Brody admits that he had only been entitled to a success fee of $5,200 for this transaction. Brody Dep. at 128-14-22.

In the aftermath of these transfers, there was a great deal of confusion among the parties. Despite deviating from the terms of the February 13th Agreement about how WMB's funds should be handled, Mr. Brody testified that he still expected the February 13th Agreement to be successfully completed, and that he circulated documents to WMB indicating that the transfers had been done in accordance with the February 13th Agreement. Brody Dep. at 107:14-108:2; Pl. Exh. 47 ¶ 8; Pl. Exh. 4. Mr. Brody subsequently learned that the entire proposed transaction was fraudulent and that the documents he was provided about the underlying insurance policies were fake or outright forgeries created by Mr. Bartholomew and Evan Sarkopoulous. Brody Dep. at 108:3-109:5; Pl. Exh. 8. Mr. Brody represented that he returned all of the money that he

had taken—the $50,000— as did certain other parties. Brody Dep. at 109:12-19; Pl. Exh. 47 ¶ 9. It is undisputed that at least $304,325 of the $552,475 loan was returned to WMB.[1] *Id.*

Eventually, Mr. Bartholomew was the subject of a criminal prosecution for his actions in this transaction and other activities. As part of that criminal proceeding, Mr. Brody was identified as a victim of Mr. Bartholomew's crimes. *See* Letter of Diane Chavez, Victim/Witness Assistance Program, Letter to Lawrence Brody, dated Sept. 20, 2016 (writing at the request of Deputy District Attorney Nagy Marcos to notify Mr. Brody of his status as a victim in *People v. Joseph Bartholomew and Wendy King-Jackson* and informing Mr. Brody of his right to submit a victim impact statement) (Def. Exh. 5). Notwithstanding this letter, WMB maintains that Mr. Brody was a knowing participant in the fraudulent scheme. *See* WMB Brief at 3-4.

Mr. Brody filed for Chapter 7 bankruptcy on June 16, 2017, and this adversary proceeding followed on September 6, 2017. This decision addresses only the dispute about the dischargeability of the debt owed by Mr. Brody to WMB.

## CONCLUSIONS OF LAW

**I. Standard of Proof for a Denial of Discharge**

"The basic policy animating the Bankruptcy Code is to afford the honest but unfortunate debtor a fresh start." *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 66 (2d Cir. 2007) (citations and internal quotations omitted). Under the Bankruptcy Code, therefore, the default outcome of a Chapter 7 case is to grant a discharge to the debtor of his or her pre-petition debts. *See* 11 U.S.C. § 727. However, the right to receive a discharge is not absolute. Section 523 of the

---

[1] Mr. Brody has argued that others involved in the transaction, including Richard Urbealis, have made subsequent payments toward the outstanding debt owed to WMB and therefore reduced WMB's damages. *See* Brody Brief at 5. This decision does not address that issue, which will be addressed in subsequent proceedings if necessary.

6

Bankruptcy Code excepts certain debts from discharge. *See* 11 U.S.C. § 523. "The party seeking an exception to discharge bears the burden of proof by a preponderance of the evidence." *Benzaquen v. Rabinowitz (In re Rabinowitz)*, 508 B.R. 874, 879 (Bankr. S.D.N.Y. 2014) (citing *Grogan v. Garner*, 498 U.S. 279, 285 (1991)). Furthermore, exceptions to discharge are construed narrowly. *See id.*; *see also Andy Warhol Found. for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162, 167 (2d Cir. 1999). This narrow construction effectuates the Bankruptcy Code's objective to provide "the debtor a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Sharmat v. Gallen (In re Gallen)*, 559 B.R. 349, 355-56 (Bankr. S.D.N.Y. 2016) (internal quotations and citations omitted). "Any ambiguities as to whether the debt satisfies an exception to discharge must be resolved in favor of the debtor because, failure to obtain a discharge can result in a debtor's financial death sentence." *In re Rabinowitz*, 508 B.R. at 879 (internal quotations and citations omitted).

**II.  Non-Dischargeability Under 11 U.S.C. § 523(a)(4)**

While WMB invokes three different subsections of 523(a), the one that best fits these facts is Section 523(a)(4). Section 523(a)(4) excepts from discharge debts that were incurred by means of "fraud or defalcation while acting in a fiduciary capacity . . . ." 11 U.S.C § 523(a)(4). To find a debt non-dischargable under this section, a plaintiff must establish the following elements: "first, that the debt was incurred in connection with an express or technical trust, second, that the debtor acted in a fiduciary capacity with respect to that trust, and third, that the debtor engaged in fraud or defalcation within the meaning of bankruptcy law." *VW Credit, Inc. v. Salim (In re Salim)*, 2015 WL 1240000, at *14 (Bankr. E.D.N.Y. Mar. 16, 2015); *see also Parklex Assocs. v. Deutsch (In re Deutsch)*, 575 B.R. 590, 600 (Bankr. S.D.N.Y. 2017). The

trust and fiduciary capacity elements are commonly addressed together. *See First Am. Title Ins. Co. v. Eberhart (In re Eberhart)*, 283 B.R. 97, 100 (Bankr. D. Conn. 2002).

Section 523(a)(4) of the Bankruptcy Code only applies to express or technical trusts. It does not cover constructive or implied trusts, or any trust created "merely on the basis of wrongful conduct (a trust ex maleficio)." *Zohlman v. Zoldan (In re Zoldan),* 226 B.R. 767, 772-73 (S.D.N.Y. 1998) (citing *OnBank & Trust Co. v. Siddell (In re Siddell)*, 191 B.R. 544, 551 (Bankr. N.D.N.Y. 1996); *Peerless Ins. Co. v. Casey (In re Casey)*, 181 B.R. 763, 766 (Bankr. S.D.N.Y. 1995); *Schwalbe v. Gans (In re Gans)*, 75 B.R. 474, 489 (Bankr. S.D.N.Y. 1987)). While state law is not dispositive, it remains relevant because bankruptcy courts "may look to state law to determine whether a trust exists." *See Chitester v. Watterson (In re Watterson)*, 524 B.R. 445, 451 (Bankr. E.D.N.Y. 2015). Common examples of express or technical trusts include those created by state statutes or by contract, and in relationships where there is a disparity in knowledge or status between two parties that gives one party a position of ascendancy over the other. *See Havens v. Salman (In re Salman)*, 2016 Bankr. LEXIS 3912, at *18-26 (Bankr. S.D.N.Y. Nov. 7, 2016) (denying a discharge where debtor failed to hold funds in trust pursuant to state law); *Kubota Tractor Corp. v. Strack*, 524 F.3d 493, 499-501 (4th Cir. 2008) (denying a discharge where debtor, as president and majority owner of a corporation, agreed to hold sales proceeds in a contractual trust in favor of an equipment manufacturer but failed to do so, and where debtor personally guaranteed the debts of the corporation under the contract); *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994) (holding that Section 523(a)(4) applies in situations where, generally speaking, there is "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter," or where "one party to the relation is incapable of monitoring the other's performance of his

8

undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals.").

As to the second element, whether a party has acted in a fiduciary capacity is a question of federal law under the Bankruptcy Code. *See In re Zoldan*, 226 B.R. at 772. Courts have observed that the "traditional" definition of acting as a fiduciary, such as under state law or the common law, is "far too broad for the purposes of bankruptcy law." *In re Gans*, 75 B.R. at 489 (citing *In re Rausch*, 49 B.R. 562, 564 (Bankr. D. N.J. 1985)). Instead, the Bankruptcy Code restricts the range of conduct that would result in the denial of a discharge. *See In re Gallen*, 559 B.R. at 357 (citing *Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, 12 (Bankr. S.D.N.Y. 2002) ("The meaning of 'fiduciary capacity' under Federal laws is more restricted than under the more general common law or state definitions.")). "[A] fiduciary relationship under the bankruptcy laws requires that (1) the trust relationship existed before the act that created the debt, (2) the wrongful act creating the debt was done during the course of the fiduciary relationship, and (3) the 'special debt' arising from the breach of a fiduciary duty must be based on an express, technical or statutory trust." *Owens v. Owens (In re Owens)*, 2005 WL 387258, at *4 (S.D.N.Y. Feb. 17, 2005) (citing *In re Gans*, 75 B.R. at 489 (Bankr. S.D.N.Y. 1998); *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934)).

If the first and second elements are satisfied that a debtor was acting in a fiduciary capacity as to a trust, a plaintiff still must show the existence of fraud or defalcation. The Bankruptcy Code incorporates the common law definition of fraud. *See Mirarchi v. Nofer (In re Nofer)*, 514 B.R. 346, 355-56 (Bankr. E.D.N.Y. 2014) (citing *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006) ("The Bankruptcy Code incorporates the common law elements of fraud,

9

'includ[ing] a false representation, scienter, reliance, and harm.'")). Fraud thus requires some form of intentional deceit. *Id.* (citing *Evans*, 469 F.3d at 283).

On the other hand, defalcation encompasses conduct where the debtor commits some sort of "intentional wrong" but there is an absence of "bad faith, moral turpitude, or other immoral conduct." *See Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-74 (2013). The term "intentional wrong" includes both knowledge and recklessness. *Id.* A defalcation analysis requires a subjective and objective evaluation of the fiduciary's conduct. *See In re Salman*, 2016 Bankr. LEXIS 3912, at *22-23 (citing *Fogg v. Pearl (In re Pearl)*, 502 B.R. 429, 441 (Bankr. E.D. Pa. 2013) ("The court must consider the debtor's actual knowledge and circumstances (i.e., the subjective) and then decide whether the related conduct constituted a gross deviation from legal standards of conduct (i.e., the objective.")). The most common form of defalcation is a failure to account for trust property. *See In re Hayes*, 183 F.3d at 171 (citing *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 511-12 (2d Cir. 1937)).

Even though the non-dischargeability exceptions of Section 523(a)(4) exist, they are not meant to remedy "garden variety" breaches of contract and the like. *See Gore v. Kresner (In re Kresner)*, 206 B.R. 303, 313-15 (Bankr. S.D.N.Y. 1997) ("Plaintiff has failed to establish that a true fiduciary relationship existed by operation of law. At best, this is a breach of contract claim."); *In re Gallen*, 559 B.R. at 360 (Bankr. S.D.N.Y. 2016) ("[I]t appears that [the] joint business venture was unsuccessful for the same reasons that many such ventures [fail]: lack of planning, excessive optimism, insufficient time provided for the business to succeed, and personal misfortune. But those reasons . . . do not satisfy the standards for nondischageability under Section[] [523](a)(4).").

**DISCUSSION**

The Court concludes that the Plaintiff has satisfied its burden by a preponderance of the evidence that the debt in question should be excepted from discharge under Section 523(a)(4) of the Bankruptcy Code.

As to the first two elements, the February 13th Agreement and the actions of Mr. Brody establish that the parties intended to create an express trust to benefit WMB and that Mr. Brody acted as a fiduciary to that trust. An express trust is created where one entity transfers property to another entity and where there is an intention to create a trust. *See New York v. Suarez (In re Suarez)*, 367 B.R. 332, 341-55 (Bankr. E.D.N.Y. 2007) (applying New York law).[2] Here, the evidence establishes that WMB transferred the funds to Mr. Nelson, with the intention of transferring that money to the insurance carriers. *See* Pl. Exh. 1; Pl. Exh. 5; Pl. Exh. 44; Exh. 47 ¶¶ 3, 5-7. More specifically, the term sheet indicates that WMB was transferring funds to Mr. Brody and his compatriots for use in funding an insurance premium financing transaction, that this was being done for the benefit of WMB, and that the funds were to be held in escrow until

---

[2] The parties have not addressed what state law applies for purposes of considering whether an express trust exists. However, the law of the states of New York, California, and Tennessee are substantially similar in their requirements for establishing an express trust. *See Gowan v. Patriot Group, LLC (In re Dreier LLP)*, 452 B.R. 391, 420 (Bankr. S.D.N.Y. 2011) (quoting *In re Doman*, 68 A.D.3d 862, 890 N.Y.S.2d 632, 634 (App. Div. 2d Dep't 2009)) ("[A] valid express trust requires (1) a designated beneficiary, (2) a designated trustee, (3) a fund or other property sufficiently designated or identified to enable title of the property to pass to the trustee, and (4) actual delivery of the fund or property, with the intention of vesting legal title in the trustee."); *Tomasi v. Savannah N. Denoce Trust (In re Tomasi)*, 2013 WL 4399229, at *9 (BAP 9th Cir Aug. 15, 2013) (quoting *Keitel v. Heubel*, 103 Cal. App. 4th 324, 337, 126 Cal. Rptr. 2d 763, 773 (Cal. Ct. App. 2002)) ("[T]he five elements required to create an express trust are (1) a competent trustor, (2) trust intent, (3) trust property, (4) trust purpose, and (5) a beneficiary."); *Tenn. Educ. Lottery Corp. v. Cooper (In re Cooper)*, 430 B.R. 480, 494 (Bankr. E.D. Tenn. 2010) (quoting *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 849–50 (6th Cir.2002)) (stating that an express trust is created under Tennessee law where the following exist: (1) a trustee who holds trust property and who is subject to the equitable duties to deal with it for the benefit of another; (2) a beneficiary to whom the trustee owes the equitable duties to deal with the trust property for his benefit; and (3) identifiable trust property); *see also LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 274 B.R. 600, 623 (Bankr. S.D.N.Y. 2002) (citing Restatement (Second) of Trusts § 2 (1959)). Given the lack of conflict in these three jurisdictions, the Court will apply New York law. *See IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.").

such time as transfers were made directly to the insurance carriers or the transaction was cancelled in its entirety. Pl. Exh. 1. Mr. Brody was directly involved with negotiating the terms of the February 13th Agreement, including those provisions regarding the use of an escrow agent. Pl. Exh. 47 ¶ 5-6. The evidence in the record also establishes that WMB relied upon Mr. Brody, in his individual capacity and as part of BPC and LFC, to ensure the success of the February 13th Agreement. Brody Dep. at 32:1-4 (indicating that in 2012 Mr. Brody was the only employee working for BPC); Pl. Exh. 4 (indicating that Mr. Brody was expected to take steps to confirm that the February 13th Agreement was properly executed); *see also Nuchief Sales, Inc. v. Harper (In re Harper)*, 150 B.R. 416, 419 (Bankr. E.D. Tenn. 1993) ("The focus of fiduciary liability is upon the actor responsible for the act rather than the corporate form. Liability is premised upon the person who actually caused the harm.") (citing *Capitol Indem. Corp. v. Interstate Agency (In re Interstate Agency)*, 760 F.2d 121, 125 (6th Cir. 1985); *Citronell-Mobile Gathering v. Herrington*, 826 F.2d 16, 23-25 (11th Cir. 1987)).[3]

Mr. Brody was also the considerably more knowledgeable and powerful individual in the February 13th Agreement. As Mr. Brody stated himself, he was the "architect" that "designed" these premium insurance financing transactions, and he repeatedly emphasized during the trial that this was his "system." Brody Dep. at 127:4-24. Given Mr. Brody's expertise in this area, it was not unreasonable for WMB to rely on Mr. Brody's expertise in this transaction. *See Artis v West (In re West)*, 339 B.R. 557, 568 (Bankr. E.D.N.Y. 2006) (citing *In re Marchiando*, 13 F.3d at 1116) (holding that plaintiffs reasonably relied upon the knowledge and representations of

---

[3] There is conflicting evidence in the record as to whether Mr. Brody was negotiating on behalf of either BPC or LFC. *Compare* Pl. Exh. 1 (indicating that the parties to the February 13th Agreement included WMB and LFC), *with* Pl. Exh. 44. (indicating that BPC, rather than LFC, was involved in the February 13th Agreement). However, Mr. Brody has testified that BPC and LFC are interchangeable entities that engaged in the same exact work. Brody Dep. at 80:9-81:8. As Mr. Brody was the architect of the transaction and the party with whom WMB negotiated, the Court finds it unnecessary to further distinguish between the corporate entities and Mr. Brody for purposes of its decision.

their attorney-in-fact when they transferred title to their homes to his church for the purpose of refinancing their mortgages).

While Mr. Brody has denied he was acting as a trustee or had any role in the transaction beyond acting as an "architect," the evidence indicates otherwise. It was Mr. Brody that ultimately sent the instructions to Mr. Nelson to execute the wire transfers to the accounts Mr. Brody controlled. 113:16-24. Mr. Brody claims that he received the instructions to do so from Mr. Goodman or someone in his office. Brody Dep. at 113:16-114:5, 116:13-21. But the fact that Mr. Brody had the ability to order the escrow agent, Mr. Nelson, to make the transfer indicates that he ultimately had direct control over the application of the trust funds. Brody Dep. at 42:12-19; *see also In re Harper*, 150 B.R. at 419. Given the evidence in the record, the Court concludes that Mr. Brody was acting in a fiduciary capacity when he improperly diverted the trust funds to himself. *See Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 622-24 (Bankr. N.D.N.Y. 2010) (holding that a knowing diversion of trust funds for personal use constituted acting in a fiduciary capacity under Section 523(a)(4) of the Bankruptcy Code).

As to the third element of defalcation, the Court finds Mr. Brody's conduct to be subjectively and objectively unreasonable. The February 13th Agreement term sheet indicates that Mr. Brody knew that any transfer other than direct a transfer to the insurance carriers was not allowed under the agreement. Pl. Exh. 1. Indeed, it is undisputed that WMB explicitly bargained for the funds to go directly to the insurance companies from the escrow agent and that Mr. Brody knew that. Pl. Exh. 47 ¶¶ 5-6. Nevertheless, Mr. Brody forwarded Mr. Nelson instructions to wire the funds WMB loaned to accounts that he personally controlled. Brody Dep. at 113:16-114:1. Upon receipt of the WMB funds, Mr. Brody also took a greater commission than he was otherwise entitled—$50,000 rather than $5,200—and transferred

$30,000 directly to Mr. Bartholomew, which is further evidence of Mr. Brody's improper intent. Brody Dep. at 128:14-25. Even if he acted pursuant to Mr. Goodman's instructions, as he claims and the Court credits, he did or should have known that his actions were improper. This is especially true given that Mr. Brody is a licensed attorney. Brody Dep. at 58:16-59:2. By initiating these transfers, Mr. Brody set into motion the chain of events that caused WMB's losses. Pl. Exhs. 9-11. This breach of fiduciary duty is "so basic and the risk of harm . . . so obvious that [the debtor] must have recognized them and proceeded despite the risk." *In re Salman*, 2016 Bankr. LEXIS 3912, at *23-24 (citing *Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 926 (7th Cir. 2016)).[4]

## CONCLUSION

For all of the reasons stated above, WMB prevails on its claim that the debt owed to it is nondischargeable under Section 523(a)(4) of the Bankruptcy Code. WMB is to settle an order on seven days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon the Mr. Brody.

---

[4] The Court notes that WMB has persistently contended that Mr. Brody knew that the transaction was a fraud the entire time and that he was acting in concert with Mr. Bartholomew. Mr. Brody vehemently disagrees credibly pointing to his efforts to return money to WMB. Given that the Court has held that there was defalcation while acting in a fiduciary capacity, it is not necessary for the Court to resolve the parties' dispute about Mr. Brody's knowledge of the underlying fraud, nor is it necessary to address WMB's other claims under Section 523.

IT IS SO ORDERED.

Dated: New York, New York
September 30, 2019

*/s/ Sean H. Lane*
UNITED STATES BANKRUPTCY JUDGE